IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 1:07-cr-00011-MP-AK

CARLOS A. CORREA,
JUSTIN M. RENTERIA,
ALEJANDRO M. VALDES,
CHRISTINA RENTERIA,
SARAH E. SUMNER,

      Defendants.

_____/

# O R D E R

This matter is before the Court on an evidentiary hearing held on November 29, 2007,

December 19, 2007, and December 20, 2007.  By prior order, the parties were directed to file

their written closing arguments, as well as any rebuttal briefs.  The parties have done so, and the

matters presented at the evidentiary hearing are therefore in a posture for decision.

In this case, the indictment charges in Count One that all of the Defendants conspired to

manufacture, distribute, and possess with intent to manufacture and distribute a controlled

substance, involving more than 1,000 marijuana plants.  Count Two charges Defendants Carlos

Correa, Justin Renteria, and Christina Renteria with conspiracy to conduct and attempt to

conduct financial transactions involving the proceeds of the charged drug activity with the intent

of promoting this illegal activity; i.e., money laundering.  Defendants Justin Renteria, Carlos

Correa, and Sarah Sumner have each filed motions to suppress.  Docs. 74, 80, 85, and 118.  The

Government has filed responses to the motions.  Docs. 100 and 107.  In addition, Defendant

Correa challenges the veracity of statements in the affidavit filed in support of the search warrant

application under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

## Background

### *Justin Renteria and Sarah Sumner: Search of the Residence at 4231 S.W. 110 Lane, Ocala*

On February 15, 2007, special agents with the Drug Enforcement Agency ("DEA") observed Defendant Sarah Sumner arrive and enter a residence in Ocala, Florida that agents suspected was being used to cultivate marijuana plants indoors. Several hours later, the agents approached the residence to conduct a "knock and talk," but no one answered. While waiting, agents allegedly heard someone walking around the house and exiting through the rear door. A tall privacy fence surrounded the residence, and when agents observed Defendant Justin Renteria open the gate to the fence, the agents initiated contact and identified themselves. The agents informed Mr. Renteria that they believed there was an indoor grow operation inside the house. The agents asked if there was anyone else in the residence, and Mr. Renteria said that there were no other people inside the house. At this point, Mr. Renteria alleges that when he proceeded to walk back to the house, law enforcement agents entered the yard through the gate and followed him, and that Mr. Renteria then objected to the police entering the property. Mr. Renteria contends that he continued walking away from the agents, opened the rear sliding glass door to enter the residence, and was in the process of closing the door behind him when an officer drew his firearm and entered the house. The special agent alleged that he could smell marijuana coming from the house as soon as he approached it to conduct the knock and talk, and that the aroma was very strong through the open back door.

Based on the alleged odor, the officer advised Defendant Renteria that he wanted to search the home, and requested consent. Mr. Renteria refused consent to the search of the home, but later told the officer that his girlfriend, Defendant Sumner, was upstairs. After being called,

Ms. Sumner came downstairs, and when questioned by a law enforcement officer, she claims

that she requested an attorney.  The officers deny that Ms. Sumner requested an attorney, and

state that they informed Defendant Sumner of her <u>Miranda</u> rights several times, and then

recorded an interview with her after Ms. Sumner told them that she wanted to cooperate.

Meanwhile, other officers conducted a protective sweep of the premises, in order to ensure that

"no one else was in the residence."  A search warrant was subsequently issued and executed

upon the property, which revealed a large indoor marijuana grow operation.

*Carlos Correa: Search of the Residence at 21748 McCallie Court, Land O' Lakes, Florida*

As part of its investigation, DEA agents suspected that a residence in Pasco County,

owned by Justin Renteria's sister, Christina Renteria, was also being used to cultivate marijuana

plants indoors.  The agents contacted the Pasco County Sheriff's Office about the possibility that

this residence was being used as a marijuana grow operation.  On February 15, 2007, the Pasco

detectives parked on a street near the residence, and alleged that they could smell the odor of

marijuana as they walked towards the house.  One detective testified that the smell of marijuana

was so strong that he believed marijuana might be growing in the wooded area near the house.

As the detective walked towards the front door of the residence, he testified that it became clear

that the marijuana odor was coming from the McCallie house.

The detectives knocked on the door, which was answered by Defendant Carlos Correa,

and the detectives advised Mr. Correa that they had received information that the residence was

being used to grow marijuana.  The agents stated that when Mr. Correa opened the front

door and exited the house to talk with them, the smell of marijuana coming from the house

was pervasive.  Defendant Correa was presented with a consent form for the detectives to search

the home, and the detectives stated that Mr. Correa became very nervous and explained that he did not live there, but was taking care of the house for a friend.  When Mr. Correa declined consent, and attempted to close the front door, the detectives allegedly stopped the door from closing and entered the house without a warrant.  Based on the strong odor of marijuana, the detectives conducted a protective sweep of the house, and then proceeded to obtain a search warrant, which was executed on February 16, 2007, after 2:00 a.m.  The search revealed hydroponic equipment, professional air purifiers, and marijuana plants growing in the bedrooms.

<u>**Argument**</u>

The central argument raised in the Defendants' motions to suppress is that even though search warrants were obtained for each residence, since they were predicated upon initial warrantless searches of the residences without any consent and without exigent circumstances, the evidence obtained pursuant to the search warrants must be suppressed.  It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable, and that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable unless the police can show that it falls within one of the exceptions based on "exigent circumstances."  <u>Payton v. New York</u>, 445 U.S. 573, 100 S.Ct. 1371 (1980).  Even if the search warrants were based solely on the allegations of marijuana odor, the Defendants argues that this claim is untrue and not worthy of credence, especially in light of other mistakes or fabrications in the search warrant affidavits, and therefore the warrants were not supported by probable cause.

The Government responds that based on exigent circumstances, officers entered the residences of Defendants Justin Renteria and Carlos Correa to secure the premises, and to

prevent the destruction of evidence within the houses as search warrants, based on probable cause developed prior to the entry of the house, were being sought.  Since the probable cause for each warrant was based on evidence other than that observed within the residences, such as odor outside the buildings and trash pulls at Mr. Renteria's house, the Government contends that the items seized pursuant to the warrants are admissible.  From the two trash pulls at Defendant Justin Renteria's house, the agents recovered suspected marijuana and items connected with indoor grow operations.  During both of the "knock and talks," the agents smelled the odor of flowering marijuana coming from within each house.  The Government argues that these observations and the trash pulls, rather than any information gathered through a protective sweep, formed the sole basis for establishing probable cause in the application for the search warrants, which were executed approximately six to seven hours after initial contact was made at each house.

Furthermore, since the agents told both Defendants Renteria and Correa that they believed there were indoor grow operations inside the houses, the Government reasons that the authorities had ample cause to believe that the Defendants and others might destroy or remove evidence of the marijuana inside the houses while the search warrants were being obtained. Because Defendant Renteria initially lied about Defendant Sumner being in the house, the Government argues that exigent circumstances existed to allow the initial warrantless entry into and a protective sweep of that house while a warrant was being obtained.  The Government's position is that the seizure of the residences was for the purpose of securing the scene until a search warrant could be obtained, and only after obtaining the warrant did the agents search the homes and seize the evidentiary items sought to be introduced against the Defendants at trial.

Because probable cause existed, the Government concludes that no Fourth Amendment violation

occurred.

### Standard of Review

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." The "touchstone of the

Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801,

1803, 114 L.Ed.2d 297 (1991). Reasonableness, in turn, is measured in objective terms by

examining the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417,

421 (1996). Moreover, the Fourth Amendment is a personal right that must be invoked by an

individual. See Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)

("[T]he Fourth Amendment protects people, not places"). The extent to which the Fourth

Amendment protects people may depend upon where those people are, and "it is beyond dispute

that the home is entitled to special protection as the center of the private lives of our people."

Minnesota v. Carter, 525 US 83, 99, 119 S.Ct. 469, 478 (1998)(J. Kennedy, concurring).

The Supreme Court has held that the Fourth Amendment prohibits the police from

making a warrantless and non-consensual entry into a suspect's home in order to make a routine

felony arrest, absent exigent circumstances. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371

(1980). The Court also held in Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68

L.Ed.2d 38 (1981), that absent exigent circumstances or consent, the police cannot search for the

subject of an arrest warrant in the home of a third party without first obtaining a search warrant

directing entry. Probable cause alone for belief that certain articles subject to seizure are in a

dwelling cannot justify a search without a warrant. See Taylor v. United States, 286 U.S. 1, 6,

52 S.Ct. 466, 467, 76 L.Ed. 951 (1932); <u>Agnello v. United States</u>, 269 U.S. 20, 33, 46 S.Ct. 4, 6,

70 L.Ed. 145 (1925).  In the instant case, the search and seizure of the residences and the

occupants by the police is legal under the Fourth Amendment only if a search warrant was

issued, or an exception to the warrant requirement–such as exigent circumstances–existed.

<em>Exceptions to the Warrant Requirement</em>

At both the Ocala and Land O' Lakes residences, law enforcement agents entered the

homes without consent and without search warrants.  While the agents waited for the warrants to

be issued, the Defendants were seized and the residences secured.  Accordingly, evidence

obtained based on this seizure of the residences and their occupants must be suppressed unless

an exception to the warrant requirement exists.

1.  Exigent Circumstances

The Government's position is that the warrantless entry into the residences was permitted

because exigent circumstances existed–preventing the destruction of evidence.  Searches and

seizures inside a home without a warrant are presumptively unreasonable. "Absent exigent

circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even

when a felony has been committed and there is probable cause to believe that incriminating

evidence will be found within."  <u>Payton v. New York</u>, 445 U.S. 573, 588, 100 S.Ct. 1371, 1381

(1980).  Because the ultimate touchstone of the Fourth Amendment is "reasonableness," the

warrant requirement is subject to certain exceptions.  "[W]arrants are generally required to

search a person's home or his person unless 'the exigencies of the situation' make the needs of

law enforcement so compelling that the warrantless search is objectively reasonable under the

Fourth Amendment." <u>Mincey v. Arizona</u>, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290

(1978).  An action is "reasonable" under the Fourth Amendment, regardless of the individual

officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action."

Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).  The officer's

subjective motivation is irrelevant.  See Bond v. United States, 529 U.S. 334, 338, n. 2, 120 S.Ct.

1462, 146 L.Ed.2d 365 (2000); Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135

L.Ed.2d 89 (1996); Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443

(1989).

　　　The Government bears the burden of establishing the existence of exigent circumstances.

"Before agents of the government may invade the sanctity of the home, the burden is on the

government to demonstrate exigent circumstances that overcome the presumption of

unreasonableness that attaches to all warrantless home entries."  Welsh v. Wisconsin, 466 U.S.

740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).  The Supreme Court has held that exigent

circumstances exist where law enforcement officers enter onto private property to fight a fire and

investigate its cause, Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486

(1978), to prevent the imminent destruction of evidence, Ker v. California, 374 U.S. 23, 40, 83

S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, United

States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).  In determining

whether sufficient exigent circumstances exist to justify the warrantless entry and search or

seizure, a court must "consider the totality of the circumstances and the 'inherent necessities of

the situation at the time.'"  United States v. Brown, 449 F.3d 741, 745 (6th Cir. 2006).  The

Eleventh Circuit has also held that the need to invoke the exigent circumstances exception to the

warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so

quickly destroyed.  United States v. Young, 909 F.2d 442, 446 (11th Cir.1990).  In determining whether exigent circumstances justify an exception to the general rule requiring a warrant, the burden rests on the Government to show that the warrantless entry was "imperative," and that a warrant could not have been obtained in time even by telephone.  McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 196, 93 L.Ed. 153 (1948).

In the instant case, the Government alleges that the Defendants were informed through the "knock and talk" that the residences were suspected marijuana grow operations.  Because it took six to seven hours to obtain a search warrant, the Government argues that the Defendants would have destroyed or removed evidence in that time had the agents not entered the house and seized the residents.  Moreover, the Government's position is that no search of the house was conducted until the warrant was issued, and that the agents only did a protective sweep of the premises, which did not form the basis of the probable cause in the warrant.

In response, the Defendants argue that because the large number of plants and equipment found could not have easily been destroyed in the relevant time frame, no exigency existed. Even if an exigency existed, the Defendants all state that any exigency was created by the agents, and therefore the exigent circumstances exception does not apply.  The Eleventh Circuit has held "that a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances."  United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991).  See also United States v. Munoz-Guerra, 788 F.2d 295, 298 (5th Cir.1986) (holding that where agents can get a warrant instead of revealing themselves and making immediate entry a foregone necessity, a warrantless search must be deemed unreasonable).  In this case, Defendants argue that they were unaware of police surveillance until the "knock and talk."  The Defendants

conclude that if the police truly had probable cause based solely on the odor of flowering

marijuana, then it was unreasonable to reveal themselves before securing a warrant.

     The question becomes at what time did the agents have probable cause to suspect a

marijuana grow operation.  If the officers had a reasonable suspicion of such activity, while it

could not justify a warrantless search of a house, it could justify the agents' approaching the

houses to question the occupants.

> Absent express orders from the person in possession against any possible trespass,
> there is no rule of private or public conduct which makes it illegal per se, or a
> condemned invasion of the person's right of privacy, for anyone openly and
> peaceably, at high noon, to walk up the steps and knock on the front door of any
> man's 'castle' with the honest intent of asking questions of the occupant thereof–
> whether the questioner be a pollster, a salesman, or an officer of the law."

Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964).  At this point, if the agents detected

the odor of marijuana, the reasonable suspicion would rise to the level of probable cause to

support a warrant, and would establish exigent circumstances to enter and seize the residences

once the occupants inside were aware of the police presence.  In Segura v United States, 104

S.Ct. 3380 (1984) the Supreme Court held "that securing a dwelling, on the basis of probable

cause, to prevent the destruction or removal of evidence while a search warrant is being sought is

not in itself an unreasonable seizure of either the dwelling or its contents." Id. at 3388.

     The most salient case on point is United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir.

1991).  In that case, the Eleventh Circuit upheld a warrantless entry into the defendants' house

where "[p]rior to their approach to house, the agents observed defendants behave suspiciously,

look about furtively, and quickly transfer tubular bags containing smaller bundles" from a car

trunk into a garage, where agents knew that at least two persons were in house but, based on

number of vehicles on premises, could have believed that the house contained more than two

persons, and where agents smelled the odor of marijuana in the house after the defendant

voluntarily opened the door in response to the agent's knocks and requests to talk with occupants

of house.  The instant case presents nearly identical facts.  The agents suspected drug activity at

both residences, but this suspicion did not rise to probable cause until contact with the

Defendants was already made, at which point the residences and the occupants had to be seized

based on the exigencies of the situation.

 As for the protective sweeps, the Supreme Court has held that the "Fourth Amendment

permits a properly limited protective sweep in conjunction with an in-home arrest when the

searching officer possesses a reasonable belief based on specific and articulable facts that the

area to be swept harbors an individual posing a danger to those on the arrest scene."  Maryland v.

Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 1099-1100, 108 L.Ed.2d 276 (1990).  At the residence

of Defendant Justin Renteria, the police had observed Defendant Sumner enter the residence.

When Defendant Renteria denied that she was there, the police certainly possessed facts that

others might be hiding on the scene.  Also, since both residences were single-family homes

where multiple occupants had been observed, and drug activities were suspected, a protective

sweep was reasonable.  Therefore, the Court finds that the warrantless entry into the two

residences and the seizure of the Defendants were reasonable under the Fourth Amendment

based on the exigent circumstances exception.

2.  Independent Source

 The Government argues that even if the initial entry into either house is deemed to be

illegal, the evidence seized as a result of the execution of the search warrants should not be

suppressed since none of the information contained in the applications for the warrants was

derived from the entry into or the occupation of the houses.  The independent source exception allows evidence to be admitted in court if knowledge of the evidence is gained from a separate, or independent, source that is completely unrelated to the illegality at hand.  "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."  Nix v. Williams, 467 U.S. 431, 432 (1984).  In this case, the Government states that probable cause was based on the initial detection of marijuana odor, not any search after the entry into the houses. Although the Court has found that the entry into either residence was not illegal, the Court agrees with the Government that the independent source exception would apply anyway since no evidence obtained as a result of this entry was used in the search warrant application.

### *Franks' Hearing: Credibility of the Probable Cause Affidavit*

Since the Court has found that the initial entries met the exigent circumstances exception, the Defendants next challenge the validity of the claims supporting the application for the search warrants.  Defendant Correa contends that the warrant was based on the false claim that the odor of marijuana was detectable outside of the house.  Without this allegation of marijuana odor emanating from the residence, all Defendants argue that there was no probable cause or exigent circumstance which would justify the detectives' entry into the residences or issuance of the search warrants.  In order to invalidate a warrant based upon a false or misleading affidavit, a defendant must show that the person applying for the warrant "either deliberately or recklessly misled the magistrate and that without the falsehood there would not be sufficient matter in the affidavit to support the issuance of the warrant." United States v. Davis, 226 F.3d 346, 351 (5th Cir. 2000).  False statements in search warrant affidavits made intentionally or with reckless

disregard for the truth may lead to the suppression of evidence seized under a warrant.  Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Under Franks, if a defendant, after an evidentiary hearing, establishes by a preponderance of evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the search warrant affidavit, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and fruits of search excluded to the same extent as if probable cause was lacking on the face of the affidavit.  Id. at 156.

The Government admits that in the Land O' Lakes warrant application, the affiant, Task Force Officer Mielke, included some statements in the body of his affidavit that were incorrect, but the Government argues that the false statements were not intentional, nor were they used to establish probable cause to search Defendant Correa's residence.  The specific errors are included on page two of the affidavit, where it states that DEA agents had just arrested "Justin Correa" at the Ocala house, rather than Justin Renteria who was arrested there.  On page three, the affiant claimed that the DEA had developed a confidential source who said that Defendant Correa was operating an indoor grow at the McCallie house, when in fact the DEA had no such source.  Also, the affidavit incorrectly claimed that there was a post-Miranda statement obtained by DEA from Defendant Justin Renteria, and that Gloria Correa had a documented DEA history as a suspected cocaine distributor and money launderer, when in fact she did not. Finally, although Defendant Carlos Correa was arrested on a marijuana charge in Alachua County, he had not been convicted of the charge as the affidavit claimed.

Setting these false materials to one side, the Government's position is that the remaining

several pages of content is sufficient to establish probable cause.  Defendant Correa argues that not only does the warrant not establish probable cause, but also the truth of the remaining claims of marijuana odor is suspect, since it comes from the same affiant.  At the <u>Franks</u> hearing, the Government stated that while the affidavit included errors, these errors were as a result of the circumstances in which the warrant was drafted, rather than any malignant intent.  Officer Mielke was receiving information on the fly from DEA agents in Ocala while he was driving an hour to the Land O' Lakes house, and then to the Assistant State Attorney to review the search warrant application.  Many of the listed false statements are clearly scrivener's errors or errors in communication, rather than deliberate or reckless falsities intended to mislead a magistrate.  Essentially every error relates to information obtained from agents at the Ocala house, and had little to do with Officer Mielke's personal observations at the McCallie house.  Removing these false statements from the search warrant application, the Court finds that the remaining content is sufficient to allow a neutral magistrate to conclude that probable cause existed.  The Court will next review the veracity of the allegations of marijuana odor at each residence.

*Validity of the Search Warrant*

Under the Fourth Amendment, a search warrant must be based on probable cause, and specifically describe the place to be searched and the items to be seized.  In order to establish probable cause, the application for a search warrant must allege "facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched."  <u>U. S. v. Martin</u>, 297 F.3d 1308, 1314 (11th Cir. 2002).  Search warrants must be supported by probable cause to satisfy the dictates of the Fourth Amendment.  <u>United States v. Harris</u>, 403 U.S. 573, 577, 91 S.Ct. 2075, 2079, 29 L.Ed.2d 723 (1971).  The probable cause standard is a

"practical, nontechnical conception." Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting

Brinegar v. United States, 338 U.S. 160, 176 (1949)).  "Probable cause to support a search

warrant exists when the totality of the circumstances allow a conclusion that there is a fair

probability of finding contraband or evidence at a particular location." United States v.

Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (citation omitted), see also United States v.

Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).  The experience and

expertise of an officer may be taken into account in determining whether there is probable cause.

In fact, what constitutes probable cause is viewed from the vantage point of a reasonably prudent

and cautious police officer.  In this case, the Defendants allege that the search warrant was not

supported by probable cause, and therefore the evidence seized must be suppressed.

1.  Probable Cause Based on the Alleged Marijuana Odor at Both Residences

The person challenging the warrant bears the burden of demonstrating that

the evidence before the warrant-issuing judge was clearly insufficient.  Deference is to be

given to the warrant-issuing judge's determination.  The reviewing court must ensure that the

magistrate had a "substantial basis for concluding that probable cause existed." See Illinois v.

Gates, 462 U.S. 213, 231 (1983).  Most of the arguments raised by the Defendants attack the

credibility of the affiants' claims that marijuana odor was detectible outside the houses.

Defendants presented evidence at the hearing that the ventilation systems prevented any odor

from escaping either house, and that it would be impossible for any of the officers to smell the

alleged odor.  Therefore, the credibility of the witnesses is central to whether probable cause

existed to believe that contraband or evidence of a crime would be found at the residences.

The Government contends that at the Ocala house, probable cause existed when Special

Agent Andrews approached the residence to conduct a knock and talk, and smelled what he recognized, based on his experience as a DEA agent, to be the odor of flowering marijuana. The affiant, Agent Walker, was also a narcotics investigator, and she also smelled the odor of marijuana emanating from the house. Similarly, the Government argues that when Task Force Officer Mielke applied for a warrant to search the residence of Defendant Correa in Pasco County, probable cause existed based on Officer Mielke's observation of marijuana odor at the Land O' Lakes house.

### A.  Marijuana Odor at the Ocala House

In response to the Government's claim, Defendant Renteria states that Agent Walker arrived at the residence several hours after the initial seizure, and that the doors and windows had been opened, allowing marijuana odor to escape the structure. Furthermore, because of the residence's sophisticated ventilation and filtration system, Mr. Renteria claims that Agent Andrews could not have smelled any marijuana odor, and Agent Walker's sworn statement serves to bolster Agent Andrews' alleged lie. At the evidentiary hearing, Mr. Renteria testified that he took a number of steps to control the marijuana odor, such as increased insulation, a carbon filtration system, two large air conditioning units without any exterior venting, and an ozone generator. The intended result of this system was to trap any odor in the grow room, to destroy or neutralize the odor, and to redirect the air from the garage into the attic. In support of this theory, Mr. Renteria presented the testimony of Richard Soehn, an expert in heating, ventilation, and air conditioning systems.

Mr. Soehn testified that there was no positive pressure in the garage where marijuana was being grown, and that no air or odor was therefore able to be emitted from the garage. Although

Mr. Soehn is not an expert in meteorology, and could not testify as to the effect of the relevant environment on the pressure of the house, he did state that these considerations are taken into account in designing air conditioning systems. In addition, Mr. Soehn testified that the nature of filtration equipment would trap any odor that did manage to leave the garage. Bolstering the latter belief was the testimony of Dr. Woodford, a chemist, who claimed that Agent Andrews could not have detected the odor of marijuana coming from Mr. Renteria's residence. Dr. Woodford based this conclusion on the fact that marijuana odor is composed of dozens of elements, and his theory that each element must reach the nose to deliver the distinct aroma of marijuana.

The Government responds that Mr. Soehn never visited the scene of the crime until seven months after the search was executed, and by that time the agents had dismantled the entire grow operation and filtration system. Because Mr. Soehn never saw the carbon filters or venting materials, he had to rely primarily on Defendant Renteria's testimony to form his opinion. This reliance precluded Mr. Soehn from knowing whether the carbon filters could effectively trap odor, whether they were saturated and ineffective, or whether the filters were even in operation on the relevant date. The Governments puts forth the latter two possibilities, since Mr. Soehn agreed that if the officers could in fact smell marijuana odor, then the filtering systems were inoperative or saturated. As for the testimony of Dr. Woodford that it was "scientifically impossible" for the marijuana odor to travel outside the house, the Government notes that Dr. Woodford is a professional defense witness, and has not published any of his theories and subjected them to peer review. Rather, Dr. Woodford testified that he thought being named in a court opinion constituted being "published," and that the courts were the best type of peer

review.  The Government cites several cases that rejected Dr. Woodford's theories, and contends

that his theory that the odor of flowering marijuana can carry no farther than a set number of feet

should also be rejected.

### B.  Marijuana Odor at the Land O' Lakes House

Soon after the agents seized the residence in Ocala, detectives and uniformed officers

approached the Land O' Lakes house in Pasco County to conduct a "knock and talk."  Defendant

Correa answered the door, and the detectives testified that a strong odor of marijuana emanated

from the house, which the Government states provided probable cause to believe that marijuana

was being possessed, processed, and cultivated within the house.  Mr. Correa argues that there

"was no strange, putrid, pungent or skunk-like odor" at the residence, and that the sworn

statement by Task Force Officer Mielke that he smelled marijuana odor at the McCallie house

was a lie "included in the affidavit to deceive the circuit court judge."

Defendant Correa also presented the testimony of Mr. Soehn and Dr. Woodford.  Mr.

Soehn testified about the ventilation system at the McCallie house, and how the filtering system

would control marijuana odors.  As with the testimony offered in support of Defendant Renteria,

the Government points out that Mr. Soehn did not visit the McCallie house until seven months

after the search and seizure, and that he had to rely on Mr. Correa to reconstruct how the

ventilation and filtration system was intended to operate.  Dr. Woodford again testified that it

was impossible for the odor of marijuana to travel the distance from which the several officers

testified that they smelled it.  In response, the Government repeats its position that Dr. Woodford

has not tested this theory scientifically, that he has not published the theory or subjected it to

peer review, and that he has never been to the site of a large ongoing indoor grow operation.

The Court credits the testimony of the numerous law enforcement agents who testified that they smelled strong marijuana odor at the residences.  Each officer had extensive experience investigating indoor marijuana grow operations.  Agent Andrews testified that he had worked for the DEA for 17 years, that he has been involved in hundreds of indoor marijuana grow investigations, that he is extremely knowledgeable of the smell created by marijuana plants, and that he had applied for approximately 60 to 100 search warrants based at least partially on the smell of the marijuana plants emanating from within the structure–all of which confirmed his detection of marijuana odor.  Relying on his experience, Agent Andrews testified that he detected odor consistent with an indoor marijuana grow operation at the Ocala residence. Officer Mielke, and Detectives Hayhurst and Campani also testified that they could smell marijuana odor coming from the Land O' Lakes residence, and they knew this smell based on their training and experience.  In opposition to these claims, the Defendants presented the testimony of several lay witnesses that no marijuana odor was detected around either residence. The Court finds these claims unpersuasive, since as Dr. Woodford himself has testified in previous cases, the detection of marijuana plant aroma requires "a trained person."  United States v. DeLeon, 979 F.2d 761, 765 n.1 (9th Cir. 1992).

Although Defendant Correa represents that the agents testified that the odor was "'skunky' or 'skunk-like,' 'putrid or 'pungent,'" it was only his expert, Dr. Woodford, who attempted to liken marijuana odor to anything other than marijuana.  In fact, despite counsel's repeated attempts to have the agents testify as to what other comparable odor marijuana smelled like, the only response each agent gave was that marijuana odor was *sui generis*–it smells like marijuana and nothing else, and they knew this odor through their narcotics training and

experience.  To further elucidate this point, the Government offered skunk odor as an

example–the agents knew what a skunk smelled like through experience, but couldn't describe

the aroma as anything other than skunk odor.  This analogy must have confused Defendant

Correa's counsel, since he repeatedly asked the witnesses if they smelled skunk odor at the

McCallie house.  Only Dr. Woodford went on record as saying certain varieties of marijuana

smelled "skunk-like" or "putrid," while others smelled like bubble gum.  As the Government

points out, Dr. Woodford admitted that he had never been to the scene of an intact indoor

marijuana grow operation, while the testifying agents had investigated hundreds of such crimes.

Furthermore, while Mr. Soehn testified as to the sophistication of the ventilation and

filtration system, much of this testimony is predicated on information provided by the

Defendants in this case.  Mr. Soehn admitted that while both residences were very well insulated,

no house can be air tight, and pressure changes cause air to flow in and out of a house.  If the

residences were as sealed as the Defendants claim, then the odor from the over one hundred

marijuana plants would be concentrated inside the residences, requiring filtration and destruction

of the odor, rather than dissipation into the environment.  The agents at each location stated that

they smelled marijuana, and Mr. Soehn testified that meant that the filtering systems were

inoperative or that the activated carbon was saturated and ineffective.  Mr. Soehn never saw any

of the filters to determine if they would be efficacious in capturing odor.  Trained narcotics

officers, however, did perceive marijuana odor at both residences.

This matter boils down to weighing the testimony of the officers against the testimony of

the Defendants, witnesses, and experts.  Dr. Woodford, although an expert in chemistry, testified

about abstract scientific principles, rather than concrete tests that he has run, or results that he

has published and subjected to peer review in the scientific community.  In contrast, numerous law enforcement agents testified about their own personal observations at both houses, and their conclusions based upon their training and experience that marijuana odor was present.  The question of probable cause should not be viewed in a hyper-technical manner.  As stated by the Supreme Court:

> In dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).  Therefore, after considering the totality of the circumstances and the experience of the agents, the Court finds that the warrant-issuing judges had substantial bases for concluding that probable cause existed to search both residences based on the marijuana odor detected by law enforcement agents.

### 2.  Probable Cause Based on Trash Pulls from the Ocala Residence

In addition to the claim of marijuana odor, the search warrant for the residence of Defendant Renteria was predicated on two prior garbage pulls, which allegedly contained evidence of a marijuana grow operation.  The Supreme Court has held that there is no expectation of privacy in trash left for collection in an area accessible to the public.  See California v. Greenwood, 486 U.S. 35 (1988).  As was previous stated,  the Fourth Amendment protects people, not places, and Defendant Renteria testified that except for the morning when his garbage was to be collected, the trash container was placed away from the street and next to his house.  The Government disputed this claims, and agents testified that the garbage was

retrieved from containers placed at the end of the driveway.

The Supreme Court has recognized that curtilage is entitled to protection under the Fourth Amendment, and has outlined several factors to determine what should be considered the extent of a home's curtilage.  United States v. Dunn, 480 U.S. 294 (1987).   The four factors used to determine whether the area claimed to be curtilage is so intimately tied to the home itself that it should be placed under the home's "umbrella" of protection are the following: (1) the proximity of the area to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature and uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passersby.  Assuming that Mr. Renteria's testimony that his garbage can was placed against his house is true, the remaining factors weigh against any expectation of privacy in his garbage.  See United States v. Segura-Baltazar, 448 F.3d 1281 (11th Cir. 2006)(finding that a defendant did not have a reasonable expectation of privacy in the trash left near the garage at his residence).  Regardless, the Court credits the testimony of the special agents that the trash was recovered from the curb, where there was clearly no expectation of privacy.

Next, both Defendant Sumner and Defendant Renteria argue that the Government has not provided any details in the warrant application about the content or amount of the "suspected marijuana," and has provided no details about when the trash pulls occurred.  Furthermore, because the trash pulls occurred at least sixty days prior to the application for the search warrant, the Defendants argue that the warrant was based on stale information.  Because the Court has found that probable cause existed based on the marijuana odor alone, any alleged staleness of the trash pull evidence is inconsequential in the probable cause analysis.  The detection of marijuana

odor at the time the warrant was issued forecloses any issue of staleness.

### 3.  Violation of the Particularity Requirement in the Warrant

Next, Defendant Correa challenges the seizure of cell phones and computers from his residence as not specifically listed in the warrant.  The particularity requirement of the Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized."  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Wuagneux, 683 F.2d 1343, 1348 (11th. Cir.1982).  The search warrant application listed the following as items to be seized: "written records of illegal cultivation of marijuana growing schedules, sales and/or delivery; written records of names, addresses, telephone numbers and/or photographs, and/or other information regarding buyers, manufacturers and sellers of narcotics, including but not limited to digitally recorded numbers on caller identification units and pagers and any other evidence that may be connected in the commission of the crime."  The Government contends that the warrant authorized the search for certain types of records which were sufficiently described, and that those records just happened to be found in electronic and digital form.  In response, Defendant Correa claims that the computers and telephones were not particularly described in the search warrant, and their seizure allowed the Government to engage in an unconstrained general search in violation of the Fourth Amendment.

The Eleventh Circuit has recognized "that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of the property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." Wuagneux, 683 F.2d at 1349.  In Reyes v United States,

798 F.2d 380, 383 (10th Cir. 1986), the court found that a warrant authorizing the seizure of

"drug trafficking records, ledgers, or writings identifying cocaine customers, sources, [etc.]."

also included an audio tape, since "in the age of modern technology and commercial availability

of various forms of items, the warrant could not be expected to describe with exactitude the

precise form the records would take."  The Tenth Circuit found that "the seizure of a specific

item characteristic of a generic class of items defined in the warrant did not constitute an

impermissible general search."  Id.  In this case, because the warrant was directed to records of

drug trafficking activity, the Government argues that the seized computer and the files contained

within were specific items within a generic class authorized by the warrant.

It seems incongruous that a warrant authorizing the seizure of written records would

include a paper document, but would not include the same document scanned into a computer in

digital form.  The Tenth Circuit has found that an audiotape created by a suspect fell within the

description of "written documents."  Twenty years after this decision, the possible means of

storing the same information are even greater and much more versatile. A secure digital card can

be easily ejected from a computer and inserted into a digital camera, cellular phone, digital audio

player, personal digital assistant, or even a television.  A search warrant cannot be expected to

describe with exactitude the precise form the records would take, and it is sufficient that the

warrant particularly describe the class of items to be seized.  Based on this, the Court finds that

documents located on a computer are within the warrant's description of  written records, and

that warrant did not grant the agents "unbridled discretion" to search for and seize whatever they

wished.  Also, the Court finds that information contained on the seized cellular phones would

fall within the class described in the warrant as "digitally recorded numbers on caller

identification units and pagers."

Furthermore, the seizure of the computer was permissible since vast stores of digital information can readily be erased in a matter of seconds. After the computer was seized, and in addition to the state warrant, a federal warrant was issued specifically authorizing the narrowed search for specific documents on the laptop. This obviates any concern under the Fourth Amendment of an impermissible general search. Therefore, the Court finds that it is inappropriate to suppress the evidence seized pursuant to the warrant.

*Miranda* Violation

As a final matter, Defendant Sarah Sumner seeks to suppress any statements made by her and taken by the agents in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Specifically, Defendant Sumner raises two <u>Miranda</u> violations. First, that law enforcement agents failed to give her a timely <u>Miranda</u> warning once she was in custody. Second, that law enforcement agents violated her <u>Miranda</u> rights by continuing to interrogate her after she had requested an attorney. The Government denies each claim.

A suspect in custody must be advised of their right to remain silent and their right to the assistance of counsel prior to any interrogation. A suspect is in "custody" when, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." <u>United States v. Muegge</u>, 225 F. 3d 1267, 1270 (11th Cir. 1987). Custodial interrogation is comprised of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). Once a suspect invokes their right to counsel, "the interrogation must cease until an

attorney is present." <u>Miranda</u>, 384 U.S. at 474.

In this case, Defendant Sumner argues that she was in custody the moment her co-defendant call her downstairs to meet with the agents.  When agents made contact with her and began questioning her, Defendant Sumner states that they should have immediately advised her of her <u>Miranda</u> rights.  It is unclear whether Ms. Sumner answered any questions prior to receiving her <u>Miranda</u> warning, but she claims to have immediately exercised her right to counsel.  Ms. Sumner states that only after this invocation did the agents instruct her on her <u>Miranda</u> rights, which Defendant claims improperly stated that she was entitled to a lawyer only if she could name one and call them on the spot.  Only after reading the warning did law enforcement agents proceeded to question Defendant Sumner and record her statements.

Defendant Sumner's central claim is that the invocation of her right to counsel prior to the <u>Miranda</u> warning required agents to cease any questioning after the warning was read.  The timing of the invocation of the right to counsel has proved to be a key issue in <u>Miranda</u> cases.  In <u>McNeil v. Wisconsin</u>, 501 U.S. 171 (1991), the Supreme Court, distinguishing the Sixth Amendment right to counsel and the Fifth Amendment right to remain silent, stated that "[i]f a suspect does not wish to communicate with the police except through an attorney, he can simply tell them that when they give him the <u>Miranda</u> warnings."  Building on this language, the Ninth Circuit stated that "<u>McNeil</u> strongly suggests that <u>Miranda</u> rights may not be invoked in advance outside the custodial context." <u>U.S. v. Wright</u>, 962 F.2d 953, 955 (9th Cir. 1992).  The Third Circuit has similarly found that <u>McNeil</u> establishes the proposition that "to be effective, a request for <u>Miranda</u> counsel must be made within 'the context of custodial interrogation' and no sooner." <u>Alston v. Redman</u>, 34 F.3d 1237, 1248 (3d Cir. 1994).

"The context of custodial interrogation" has been expanded to include the time when "interrogation is imminent "  The Tenth Circuit has held that where a defendant was arrested and handcuffed along with three women in his house, the fact that the defendant invoked his right to counsel before police were required to inform him of that right was irrelevant in determining whether defendant's incriminating statement should be suppressed. U.S. v. Kelsey, 951 F.2d 1196, 1198 (10th Cir. 1991).  In United States v. Grimes, 142 F.3d 1342, 1348 (11th Cir.1998), the Eleventh Circuit adopted the view of several other circuits that "Miranda rights may be invoked only during custodial interrogation or when interrogation is imminent."  Therefore, in this case, the statements of Defendant Sumner must be suppressed if she was interrogated while in "custody" when a Miranda warning was required to be given, or if the statements were elicited after Defendant requested an attorney while in "the *context* of custodial interrogation," i.e., when interrogation is imminent.

During the evidentiary hearing, the Government presented the testimony of agents at the scene that Ms. Sumner was advised of her Miranda rights on three different occasions.  First, Agents Andrews stated under oath that he advised both Ms. Sumner and Mr. Renteria of their Miranda rights at the same time.  While the Government concedes that Defendant Renteria initially said that he was interested in cooperating but that he wanted to talk to his lawyer first, Agent Andrews testified that Defendant Sumner never told him that she wanted to speak with a lawyer or that she wished to remain silent.  After Agent Riley arrived at the scene, he directed that the Defendants again be advised of their Miranda rights "as a protective measure in case it had not yet been done."  Agent Riley did not ask either Defendant any questions, and he maintains that Ms. Sumner never invoked her right to counsel or the right to remain silent.

Finally, before Ms. Sumner gave her recorded statement, Agent Walker again advised her of her

<u>Miranda</u> rights.

Defendant Sumner argues that Agent Walker knew that she had previously asked for a

lawyer, and ignoring the request for counsel, Agent Walker took a statement from Ms. Sumner

anyway.  The videotaped statement presented in court showed Agent Walker speaking with Ms.

Sumner about how Defendant had previously been read her rights and had decided "not to

cooperate."  Ms. Sumner answered in the affirmative, and Agent Walker then said that it was her

understanding that Ms. Sumner now wished to give a statement.  Ms. Sumner stated that she did

want to give a statement, and she proceeded to express her ignorance of the grow operation until

that day.  The Government argues that even if Defendant's wish "not to cooperate" included the

invocation of the right to an attorney, by reaching out to Agent Walker and asking to speak with

her, Defendant's initiation of communication waived the prior wish to speak with counsel first or

to remain silent.

The Court reviewed the video of Defendant Sumner speaking with Agent Walker, and it

appears that Ms. Sumner willing chose to waive her right to remain silent or to speak with a

lawyer.  She had been repeatedly informed of these rights, and the Court finds compelling that

co-Defendant Justin Renteria was not questioned at all after the invocation of his right to

counsel.  In fact, Mr. Renteria was provided with an opportunity to contact counsel, and when

this proved unsuccessful, he was not further questioned even though he was the prime suspect

and had expressed an interest in cooperating (albeit with the assistance of counsel).  Ms.

Sumner's decision "not to cooperate," if it can be seen as an invocation of either the right to

remain silent or the right to have an attorney present, was withdrawn when she changed her mind

and decided to give a statement.  Although she now alleges that the agents initiated the contact that led her to cooperate, the Court finds that this is unsupported in the record.  Accordingly, the Court denies Defendant Sumner's motion to suppress her statements.

Therefore, after considering the motions to suppress, the Government's responses, the Defendants' replies, and the matters presented at the evidentiary hearing, it is hereby

**ORDERED AND ADJUDGED:**

1.  Defendant Justin Renteria's motions to suppress, Docs. 74 and 85, are denied.

2.  Defendant Carlos Correa's motion to suppress Doc. 80, is denied.

3.  Defendant Sarah Sumner's motion to suppress,  Doc. 118, is denied.

**DONE AND ORDERED** this  _18th_ day of April, 2008

_s/Maurice M. Paul_

Maurice M. Paul, Senior District Judge